WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


TANADGUSIX CORPORATION, et al.,        )
                                       )
                        Plaintiff,     )
                                       )
        vs.                            )
                                       )
ARM, LTD., an Illinois corporation, et al.,  )
                                       )      No. 3:18-cv-0219-HRH
                        Defendants.    )
_____)


<u>O R D E R</u>

Motion to Dismiss;
<u>Motion for Partial Summary Judgment</u>

    Defendant Unimerica Insurance Company moves to dismiss the claims plaintiffs have

asserted against it.[1]  This motion is opposed.[2]  Also pending in this case is plaintiffs' motion

for partial summary judgment.[3]  This motion is opposed.[4]  Oral argument has been heard on

both motions.

_____

    [1]Docket No. 46.

    [2]Docket No. 54.

    [3]Docket No. 59.

    [4]Docket No. 66.

Background[5]

Plaintiffs are Tanadgusix Corporation ("TDX"), Ron Philemonoff, Jeanette Matthews, Robert Dean Hughes, Benjamin English, Larry Cooper, and John Lyons. The individual plaintiffs are trustees of the Tanadgusix Corporation Health and Welfare Trust. Defendants are ARM, Ltd., Hines & Associates, Inc., and Unimerica Insurance Company.

Plaintiffs allege that "TDX and the Trust have established an Employee Health Plan ('the Plan') for employees of TDX and its subsidiaries, and qualifying Directors of TDX."[6] Plaintiffs allege that "on June 1, 2005, Bering Sea Eccotech, Inc., a wholly owned TDX subsidiary, as original Plan Sponsor, entered into an Administrative Services Agreement with ARM . . . as Contract Administrator, to provide administrative services to the Plan, including, but not limited to the processing and payment of benefits in accordance with the Plan."[7] Plaintiffs allege that "[s]ubsequently, TDX took over as Plan Sponsor, and at all times relevant was the Plan Sponsor."[8]

Plaintiffs allege that "in 2014, a dependent ('Patient') of an employee of TDX Power, a TDX subsidiary, was diagnosed with [the] rare disease of paroxysmal nocturnal

---

[5]This background is taken from the allegations in plaintiffs' second amended complaint and the documents attached to it.

[6]Second Amended Complaint [etc.] at 3, ¶ 6, Docket No. 43.

[7]Id. at 3-4, ¶ 11.

[8]Id. at 4, ¶ 12.

hemoglobinuria."[9]  Plaintiffs allege that it was determined "that it was medically necessary to treat the Patient with infusions of a drug named Soliris[,]" which was "reputed to be the most expensive drug in the world."[10]  The Patient was treated "at Scott & White Hospital in Waco, Texas ('Hospital'), where the Patient's mother worked."[11]

Plaintiffs allege that "[t]he Hospital is a Participating Provider in an Aetna network, whereby the Hospital, through an agreement with Aetna ('Hospital Agreement') allegedly provides discounted rates for services to patients if they are part of a health plan that can access these rates through the Aetna network."[12]  Plaintiffs allege that "ARM . . . had a contract with Aetna . . . which allowed it to access this Aetna network for a fee, purportedly giving TDX Plan members, including the Patient, the opportunity to obtain discounted rates."[13]

Plaintiffs allege that "ARM initially hired or associated with Defendant Hines & Associates, Inc. ('Hines') to review the cost of Soliris and provide medical case management of the Patient on behalf of ARM and the Trust."[14]  Plaintiffs allege that "[t]he Hines case

---

[9]Id. at 6, ¶ 23.

[10]Id. at 6, ¶¶ 24-25.

[11]Id. at 6, ¶ 26.

[12]Id. at 6, ¶ 27.

[13]Id. at 6, ¶ 28.

[14]Id. at 7, ¶ 31.

manager claims she contacted the Hospital and obtained a cost quote of $12,200 per 600mg infusion and $18,200 per 900 mg fusion. . . ."[15]  Plaintiffs allege that "[t]he Hines employee failed to document this alleged oral quote, but passed the alleged quote information on to ARM."[16]

Plaintiffs allege, however, that in 2014, the Hospital billed $35,956 for an infusion and then $51,934, "for which the Hospital expected payment of $21,573.60 and $32,360.40 respectively (60% of amount billed)[.]"[17]  Plaintiffs allege that rather than paying what the Hospital was billing, "ARM continued to reprice each Hospital claim and had the Trust pay a much-reduced amount solely based on an alleged single oral quote from the Hospital to ARM via Hines, which quote the Hospital denies even providing."[18]

Plaintiffs allege that "[i]n February of 2017, three of the Trustees of the Trust, TDX Power, Inc., . . . along with ARM and the ARM network provider . . . were sued by the Hospital" in Texas.[19]  Plaintiffs allege that the Hospital was seeking "$1,765,482.12 for underpayment of forty-six claims[.]"[20]

---

[15]Id. at 7, ¶ 32.

[16]Id. at 7, ¶ 33.

[17]Id. at 7-8, ¶ 35.

[18]Id. at 10, ¶ 44.

[19]Id. at 11, ¶ 53.

[20]Id. at 12, ¶ 55.

Plaintiffs allege that the Trust first obtained stop-loss insurance from Unimerica in 2016 and that the Trust had a stop-loss insurance policy with Unimerica through the end of December 2018.[21] Although Unimerica was not the Trust's stop-loss insurer in 2015, the Unimerica Policy provides "that the Benefit Period was 'Covered Expenses Incurred from January 1, 2015 through December 31, 2018. . . .'"[22] Thus, plaintiffs allege that "Unimerica agreed to pay claims from 2015 that were submitted to it during the extended Benefit Period for which TDX paid an increased premium to Unimerica."[23] Plaintiffs allege that the Policy set a specific deductible for the Patient of $450,000.[24]

Plaintiffs allege that "[d]uring both 2016 and 2017 the Patient's medical treatment at the Hospital exceeded the Patient's $450,000 deductible under the Unimerica Policy and ARM submitted the excess Hospital claims to Unimerica, which paid the excess pursuant to its Policy with TDX."[25]

Plaintiffs allege that in November 2017, ARM was terminated as the plan administrator and the Trust "retained Professional Benefit Services, Inc. ('PBS') to [a]dminister claims

----

[21]Id. at 15, ¶ 65.

[22]Id. at 16, ¶ 70.

[23]Id. at 16, ¶ 71.

[24]Id. at 15, ¶ 66.

[25]Id. at 16, ¶ 72.

under the TDX Plan."[26] Plaintiffs allege that starting in November 2017 "and continuing into 2018, PBS utilized a preferred health care provider network that had a contract with the Hospital, and pursuant to the agreements, the Hospital was paid at the 60% of the Hospital contract rate for Patient treatment in late 2017 and 2018."[27] Plaintiffs allege that "[a]s a result, the Hospital ha[d] no underpayment claims for 2018, but the Patient exceeded her $450,000 deductible . . . and the excess claim was submitted to Unimerica for payment, which payment Unimerica processed without complaint or modification at the time."[28]

Plaintiffs allege that "[o]n August 6, 2018, the Trustees provided Unimerica with a Scott & White summary sheet of underpayment claims by year."[29] Plaintiffs allege that according to the summary sheet, "Unimerica would owe at least $1,628,835.92 toward the unpaid Hospital claims."[30] Specifically, this summary sheet showed that the Hospital claimed the underpayment for 2015 was $503,489.11; $548,818.61 for 2016; and $576,528.20" for 2017.[31] Plaintiffs allege that "[b]ecause TDX and the Trust believed that

---

[26]Id. at 17, ¶ 73.

[27]Id. at 17, ¶ 74.

[28]Id. at 17, ¶ 75.

[29]Id. at 17, ¶ 77.

[30]Id. at 18, ¶ 79.

[31]Exhibit D at 1, Second Amended Complaint [etc.], Docket No. 43.

Unimerica owed any underpayments to the Hospital, TDX and the Trust requested that Unimerica attend a mediation of all Parties in the Hospital Litigation. . . ."[32]

Plaintiffs allege that "[o]n August 31, 2018 the United States Magistrate Judge in the Hospital Litigation issued a Report and Recommendation to the United States District Judge in which he found, in part, that ARM . . . had breached" its agreements with plaintiffs "by processing and repricing the Hospital claims at less than the contractually agreed upon rate of 60% of the billed charge."[33]

Plaintiffs allege that "[t]he mediation of the Hospital Lawsuit took place . . . on September 19, 2018 without the participation of Unimerica or the Aetna entities."[34] Plaintiffs allege that "[a]t the mediation TDX and the Trust, along with ARM, reached a tentative settlement with the Hospital entirely contingent on Unimerica participating in a final settlement to pay at least $1,500,000 for the underpaid Hospital claims."[35] Plaintiffs allege that "TDX and the Trust agreed to have the Hospital claims re-adjudicated in accordance with the Magistrate's decision and in accordance with the TDX Plan Document and Unimerica Policy."[36]

---

[32]Second Amended Complaint [etc.] at 18, ¶ 80, Docket No. 43.

[33]Id. at 19, ¶ 86.

[34]Id. at 19, ¶ 88.

[35]Id. at 19, ¶ 89.

[36]Id. at 19, ¶ 90.

Plaintiffs allege that "[i]n addition to the Hospital claims, in 2018 the Patient underwent surgery at Texas Children's Hospital, and Texas Children's Hospital has submitted claims to be paid under the TDX Plan in an amount in excess of $2,000,000.00."[37]

Plaintiffs allege that on November 12, 2018, the "repriced" Hospital claims for the Patient's treatment in 2015, 2016, and 2017 were submitted to Unimerica.[38] In addition, "the Hospital claims for 2018 and all of the Children's Hospital claims" were submitted to Unimerica "because the Patient had already exceeded the Patient's Specific Deductible of $450,000 for 2018."[39]

Plaintiffs allege that Unimerica responded to these claims on January 4, 2019.[40] Plaintiffs allege that in the January 4, 2019 letter, "Unimerica . . . purported to exercise its rights under the Policy provision Paragraph titled 'Misstated Data, Concealment, Fraud' to unilaterally, without any prior notice to TDX and the Trust, retroactively change the terms and conditions of the Policy."[41] In the January 4, 2019 letter, Unimerica stated that in October 2015, ARM had provided it with "claim data [that] showed that [the Patient] was

---

[37]Id. at 20, ¶ 92.

[38]Id. at 20, ¶ 93.

[39]Id. at 20-21, ¶ 94.

[40]Id. at 21, ¶ 96.

[41]Id. at 21, ¶ 98.

receiving Soliris once every two weeks at a cost of $24,400 per treatment."[42]  Unimerica

stated that "[r]elying on this data, [it] estimated that, as of August 31, 2015, the total year-to-

date spend for [the Patient's] Soliris treatment was $564,000, totaling approximately

$745,000 per year."[43]  Unimerica further stated that its "underwriting team used and relied

on the ARM reports[] to determine whether to quote, issue a policy and to establish

appropriate terms and conditions, in accordance with industry standards."[44]  Based on the

alleged misrepresentation about the cost of Soliris treatment, Unimerica changed the

deductible for the Patient for the years 2016-2018 to $1,050,000 and excluded any claims

incurred in 2015.[45]

Plaintiffs allege that on January 28, 2019, Unimerica provided "an Explanation of

Benefits ('EOB') for [the] Patient's claims that had been submitted on November 12,

2018."[46]  Unimerica paid $2,106,362.63 of the claims but denied $2,212,086.67 of the

claims.[47]

---

[42]Exhibit G, Second Amended Complaint [etc.] at 1, Docket No. 43.

[43]Id.

[44]Id.

[45]Id. at 9.

[46]Second Amended Complaint [etc.] at 21, ¶ 99, Docket No. 43.

[47]EOB, Exhibit H at 1, Second Amended Complaint [etc.], Docket No. 43.

In their second amended complaint, plaintiffs assert a breach of contract claim (Count XII), a bad faith claim (Count XIII), a claim for punitive damages (Count XIV), a UTPA claim (Count XV), and a claim for declaratory judgment (Count XVI) against Unimerica. Plaintiffs seek a declaration

> that Unimerica:  (a) did not have the right to unilaterally modify and reform the Unimerica Policy; (b) if Unimerica had the right to unilaterally modify and reform the Unimerica Policy, it did so in a manner to make the Policy illusory, unenforceable, and non-binding on TDX and the Trust with respect to the purported unilateral changes by Unimerica; and (c) TDX and the Trust can enforce the Unimerica Policy as issued without the Unimerica changes.[48]

Pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, Unimerica now moves to dismiss all of plaintiffs' claims asserted against it.  And, plaintiffs move for summary judgment on their breach of contract and declaratory judgment claims on the grounds that Unimerica's conduct violated AS 21.54.010 and AS 21.51.050.

## Discussion

"'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Zixiang Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[48]Second Amended Complaint [etc.] at 60-61, ¶ 239, Docket No. 43.

misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678). "The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully." Id. "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 678). "[T]he complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" In re Rigel Pharmaceuticals, Inc. Securities Litig., 697 F.3d 869, 875 (9th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." Adams v. U.S. Forest Srvc., 671 F.3d 1138, 1142-43 (9th Cir. 2012). "A dismissal under rule 12(b)(6) 'may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" Kwan v. SanMedica Int'l, 854 F.3d 1088, 1093 (9th Cir. 2017) (quoting Johnson v. Riverside Healthcare Sys., LP, 534 F3.d 1116, 1121 (9th Cir. 2008)).

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there

is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).
In deciding a motion for summary judgment, the court views the evidence of the non-movant
in the light most favorable to that party, and all justifiable inferences are also to be drawn in
its favor.  <u>Id.</u> at 255.

<u>breach of contract and declaratory judgment claims</u>

Plaintiffs' breach of contract and declaratory judgment claims hinge on the question
of whether Unimerica could retroactively eliminate coverage for the 2015 claims and raise
the deductible for the Patient for 2016-2018.  Unimerica argues that these claims are not
plausible because it had the right to retroactively adjust the Policy under the terms of the
Misrepresentation Clause.  Unimerica contends that its adjustments to the Policy were
permitted by the unambiguous terms of the Policy and plaintiffs' reasonable expectations.
Plaintiffs, on the other hand, move for summary judgment on these claims, arguing that
Unimerica's unilateral adjustment of the terms of the Policy violated AS 21.54.010 and AS
21.51.050.

We begin with the question of whether plaintiff's breach of contract and declaratory
judgment claims are plausible, which requires the court to construe the Misrepresentation
Clause.  "Alaska has adopted the doctrine of reasonable expectations."  <u>West v. Umialik Ins.</u>
<u>Co.</u>, 8 P.3d 1135, 1138 (Alaska 2000).  "'The obligations of insurers are generally
determined by the terms of their policies.'"  <u>Id.</u> (quoting <u>Bering Strait Sch. Dist. v. RLI Ins.</u>
<u>Co.</u>, 873 P.2d 1292, 1294 (Alaska 1994)).  "But because insurance policies are contracts of

adhesion, they are construed according to the principle of 'reasonable expectations.'" Id. (quoting Bering Strait Sch. Dist., 873 P.2d at 1294). "Under the reasonable expectations doctrine, [t]he objectively reasonable expectations of applicants . . . regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Id. (citation omitted). "It is a settled principle that ambiguities in an insurance policy are construed in favor of the insured." Id. "The court need not find the policy ambiguous, however, to construe it under the reasonable expectations doctrine." Id. "To determine the parties' reasonable expectations, the court examines (1) the language of the disputed policy provisions; (2) the language of other provisions in the same policy; (3) extrinsic evidence; and (4) case law interpreting similar provisions." Id.

The Misrepresentation Clause provided:

> The Company has relied on the information provided by the Policyholder, the Administrator or any agent of the Policyholder, in the issuance of this Policy, or for any Subsequent Policy Period. In the event of a misrepresentation, concealment or omission of a fact, or a mistake of fact (whether or not a mutual mistake), any of which materially affect the underwriting, premium, rating or terms and conditions of this Policy, the Company may, at its option:
>
> a)    increase premium rates, attachment points and/or otherwise change the terms and conditions of this Policy. Such increase or change to be effective retroactively to the Effective Date or as of any premium due date thereafter, or
>
> b)    terminate this Policy as of the next premium due date.[49]

---

[49]Exhibit C at 9, Second Amended Complaint [etc.], Docket No. 43.

Unimerica argues that the Misrepresentation Clause unambiguously gave it the right to change the terms and conditions of the Policy retroactively if there was a material misstatement of fact. Unimerica argues that this is the only reasonable interpretation of the Clause, which means that plaintiffs should have reasonably expected that Unimerica would change the terms of the Policy if it learned that there had been a misrepresentation of material information. Unimerica argues that plaintiffs have not alleged any facts that suggest that they understood or expected the Misrepresentation Clause to mean something other than what it unambiguously provided.

Plaintiffs do not suggest a different interpretation of the Misrepresentation Clause. Rather, they argue that if the clause is interpreted as Unimerica contends it should be, the Clause is unenforceable. First, plaintiffs argue that under Unimerica's interpretation, the Misrepresentation Clause is a "discretionary clause" and that such clauses are prohibited under Alaska law. Plaintiffs contend that a "discretionary clause" is one "that purport[s] to confer discretion upon the insurer in determining the meaning of the terms within the insurance contract, most importantly for the purpose of determining the insured's eligibility for insurance benefits."[50] An example of such a clause is: "'Insurer has full discretion and authority to determine the benefits and amount payable as well as to construe and interpret

---

[50]Pathak, Discretionary Clause Bans & ERISA Preemption, 56 S.D. L. Rev. 500, 501 (2011).

all terms and provisions of the plan.'"[51]  "The proposition set forth in such clauses - that the insurer's position about the meaning and applicability of the insurance contract carries more weight than the insured's position about those same issues - is contrary to the law in most states."[52]

Plaintiffs argue that Alaska is one of the states that prohibits discretionary clauses. As proof, plaintiffs cite to the State of Alaska Division of Insurance's Stop Loss Policy Form Checklist.[53]  The Checklist states that a stop-loss policy "may not assert exclusive or discretionary authority to interpret contractual provisions" and cites to AS 21.36 and AS 21.42.130 as the statutory sources of this prohibition.[54]  Chapter 36 of Title 21 governs trade practices and fraud in the insurance industry.  AS 21.42.130 provides, in relevant part:

> The director shall disapprove a form filed under AS 21.42.120
> or withdraw a previous approval of the form only if the form
>
> (1) is in any respect in violation of or does not comply with this
> title;

---

[51]Id. (quoting Standard Ins. Co. v. Morrison, 584 F.3d 837, 839 (9th Cir. 2009)).

[52]Id.

[53]Exhibit A at 1, Plaintiffs' Opposition to Unimerica Insurance Company's Motion to Dismiss the Second Amended Complaint, Docket No. 54.  This checklist is available publically online on the State of Alaska commerce department's website.  The court may consider this exhibit without converting Unimerica's to dismiss into a motion for summary judgment because the court may take judicial notice of information publically available on government websites.  Daniels–Hall v. National Educ. Ass'n, 629 F.3d 992, 998–99 (9th Cir. 2010).

[54]Exhibit A at 1, Plaintiffs' Opposition to Unimerica Insurance Company's Motion to Dismiss the Second Amended Complaint, Docket No. 54.

> (2) contains or incorporates by reference, where incorporation
> is permissible, an inconsistent, ambiguous, or misleading clause,
> or exception and condition that deceptively affects the risk
> purported to be assumed in the general coverage of the con-
> tract[.]

Plaintiffs argue that the Misrepresentation Clause is a prohibited discretionary clause because Unimerica is claiming that the Clause gives it the sole authority to decide that benefits can be dramatically changed and reduced. Plaintiffs argue that such an interpretation "deceptively affects the risk purported to be assumed" in the Policy. AS 21.42.130. Thus, plaintiffs argue that it is at least plausible that the Misrepresentation Clause is a prohibited discretionary clause and unenforceable. And, if it is plausible that the Clause is unenforceable, then plaintiffs argue that their breach of contract and declaratory judgment claims should not be dismissed.

As Unimerica points out, plaintiffs did not allege this theory in their second amended complaint, and the "[c]ourt need not . . . consider facts or legal theories alleged for the first time in a plaintiff's opposition brief." Leibert v. Philadelphia Housing Auth., Case No. 10–5412, 2011 WL 940339, at *3 (E.D. Pa. March 14, 2011). But even if the court were to consider this argument, it fails because the Misrepresentation Clause is not a prohibited discretionary clause. The Misrepresentation Clause did not give Unimerica the exclusive right to interpret provisions of the Policy. Rather, it gave Unimerica the authority to adjust terms of the Policy if the insured misrepresented information that would have materially affected the underwriting of the policy, the premiums, or the terms and conditions of the

policy. This is not unfettered discretion as plaintiffs contend nor does Unimerica's interpretation of the Misrepresentation Clause leave the insured without a means to challenge any adjustment Unimerica might make due to material misrepresentations. The Misrepresentation Clause provided that Unimerica could only change the terms and conditions of the Policy if there were a misrepresentation that "materially affect[ed] the underwriting, premium, rating or terms and conditions of this Policy[.]"[55] The insured could challenge whether a representation was in fact a misrepresentation and if it were, whether that misrepresentation was material. As such, Unimerica's discretion under the Misrepresentation Clause was not unfettered. The Misrepresentation Clause is not a prohibited discretionary clause.

Plaintiffs next appear to argue that Unimerica's interpretation of the Misrepresentation Clause makes coverage under the Policy illusory. "Illusory promises are those that by their terms make performance entirely optional with the promisor." Askinuk Corp. v. Lower Yukon School Dist., 214 P.3d 259, 267 (Alaska 2009) (citation omitted). To the extent that plaintiffs are making such an argument, it fails. The Misrepresentation Clause did not make coverage under the Policy entirely optional for Unimerica. Rather, the Clause permits Unimerica to adjust the terms of the Policy if there were material misrepresentations. Moreover, given that Unimerica paid more than $2,000,000 of the claim TDX submitted in November 2018, any allegation that coverage under the Policy was illusory is not plausible.

---

[55]Exhibit C at 9, Second Amended Complaint [etc.], Docket No. 43.

Plaintiffs next argue that Unimerica's interpretation of the Misrepresentation Clause renders the Clause unconscionable because it allowed Unimerica to unilaterally change the terms of the Policy. As one court has noted, "even when unilateral modification rights are explicitly granted in a contract, those clauses are often found invalid as . . . unconscionable." Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc., Case No. 1:16-cv-1613, 2017 WL 1479425, at *9 (E.D. Va. April 21, 2017), reversed on other grounds, 929 F.3d 135 (4th Cir. 2019). The Four-C-Aire court cited to Ingle v. Circuit City Stores, Inc., 328 F.3d 1165 (9th Cir. 2003). There, the Ninth Circuit considered the enforceability of an arbitration agreement that employees of Circuit City were required to sign as a prerequisite to employment. Id. at 1170-71. Applying California law, the Ninth Circuit found the arbitration agreement unconscionable both procedurally and substantively. Under California law, "[s]ubstantive unconscionability centers on the terms of the agreement and whether those terms are so one-sided as to shock the conscience." Id. at 1172 (citation omitted). Of import here, the Ninth Circuit found "the provision affording Circuit City the unilateral power to terminate or modify the contract" to be "substantively unconscionable." Id. at 1179.

Plaintiffs acknowledge that the Alaska Supreme Court has never addressed the precise issue of whether a clause with language identical or similar to that of the Misrepresentation Clause would be unconscionable. However, plaintiffs contend that the Alaska Supreme Court touched on this issue in Gibson v. Nye Frontier Ford, Inc., 205 P.3d 1091 (Alaska

2009).  There, Gibson argued that the arbitration agreement in his employment contract was unconscionable, in part, because "it [was] subject to unilateral change by the employer[.]" Id. at 1093.  The court found that the arbitration agreement was not subject to unilateral change by Nye, but in doing so observed "the prevalence of the view that arbitration clauses that may be changed unilaterally are unconscionable[.]"  Id. at 1097.  Thus, plaintiffs insist that if faced with this issue, the Alaska Supreme Court would find the Misrepresentation Clause unconscionable.

"If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict 'how the state high court would resolve it.'" Albano v. Shea Homes Ltd. Partnership, 634 F.3d 524, 530 (9th Cir. 2011) (quoting Air–Sea Forwarders, Inc. v. Air Asia Co., 880 F.2d 176, 186 (9th Cir. 1989)).  "Under Alaska law a contract term may be unconscionable 'where . . . circumstances indicate a vast disparity of bargaining power coupled with terms unreasonably favorable to the stronger party.'"  Nye Frontier Ford, 205 P.3d at 1096 (quoting Municipality of Anchorage v. Locker, 723 P.2d 1261, 1265–66 (Alaska 1986)).  Although there is often a vast disparity in bargaining power between the insured and the insurer, that is not the case here.  TDX is a sophisticated corporate entity with options other than purchasing stop-loss insurance from Unimerica. Moreover, as discussed above, the Misrepresentation Clause did not allow Unimerica to unilaterally change the terms of the Policy for any reason whatsoever.  Rather, the Clause allowed Unimerica to change the terms of the Policy if there were misrepresentations made

by the insured, or someone acting on behalf of the insured, that "materially affect[ed] the underwriting, premium, rating or terms and conditions of this Policy[.]"[56] This is consistent with Alaska law. AS 21.42.110 governs representations in insurance applications and provides in relevant part, that

> [m]isrepresentations, omissions, concealment of facts, and incorrect statements may not prevent a recovery under the policy or contract unless either
>
> (1) fraudulent;
>
> (2) material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
>
> (3) the insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract in as large an amount, or at the same premium or rate, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

Thus, this court predicts that the Alaska Supreme Court would not find the Misrepresentation Clause unreasonable or unconscionable.

But even if the Misrepresentation Clause is interpreted as Unimerica suggests, plaintiffs argue that their breach of contract and declaratory judgment claims should not be dismissed because it is plausible that there was no misrepresentation about the price of Soliris This argument fails. In their opposition to the motion to dismiss, plaintiffs take issue with

---

[56]Exhibit C at 9, Second Amended Complaint [etc.], Docket No. 43.

Unimerica's contention that they have admitted that ARM provided false information to Unimerica about what the Hospital was charging for Soliris. Rather, plaintiffs contend that they have alleged that there was a dispute as to the pricing of Soliris and that <u>Unimerica</u> claims that it was provided certain information by ARM about the cost of Soliris during the underwriting process.

However, in their second amended complaint, plaintiffs allege that "Hines and ARM knew" that the case management reports "were being sent to TDX, the Trust and [the] stop-loss carriers,"[57] that the August 2015 Hines Report stated that "health plan allowing amount quoted to case manager" for Soliris,[58] that "prior to the issuance of the Unimerica Policy, Unimerica knew that the basis for payment to the Hospital for Eculizumab [another name for Soliris] at the time of underwriting, and for the future, would be the amount the plan was allowing based on an 'amount quoted to the case manager,' and not based on any network contracted rate[,]"[59] and that ARM withheld "relevant information about the repricing of Soliris" from the stop-loss carriers.[60] Although, "generally, the question of whether an applicant's statements were false or misleading is a jury question[,] . . . when an applicant admits that a statement is false, . . . courts can decide this question as a matter of law."

---

[57]Second Amended Complaint [etc.] at 10, ¶ 47, Docket No. 43.

[58]<u>Id.</u> at 47, ¶ 191.

[59]<u>Id.</u> at 48, ¶ 192.

[60]<u>Id.</u> at 30, ¶ 127(c).

<u>Bennett v. Hedglin</u>, 995 P.2d 668, 671 (Alaska 2000). By their allegations in the second amended complaint, plaintiffs have admitted that Unimerica was given false information about the cost of Soliris, or in other words, that there was a misrepresentation about the price of Soliris.

But plaintiffs argue that even if there were a misrepresentation about the price of Soliris, which there was, it is plausible that this misrepresentation did not "materially affect the underwriting, premium, rating or terms and conditions of" the Policy.[61] At oral argument, plaintiff's counsel argued that there is a question of fact as to whether the price of Soliris was material given all the other information that Unimerica had about the Patient when it first underwrote the Policy in 2015.[62] Plaintiffs have alleged that the claims data that Unimerica received in 2015 included an August 2015 report prepared by Hines.[63] That report included detailed information about the nature of the Patient's condition, her current course of treatment, and her anticipated future needs, which included ongoing Soliris treatment.[64] Given all the information that Unimerica had about the Patient, plaintiffs argue that it is at least plausible that the information about the price of Soliris was not material.

---

[61]Exhibit C at 9, Second Amended Complaint [etc.], Docket No. 43.

[62]Transcript of Oral Argument [etc.] at 24:7-22, Docket No. 76.

[63]Second Amended Complaint [etc.] at 47, ¶ 190, Docket No. 43.

[64]Exhibit K, Second Amended Complaint [etc.], Docket No. 43.

Unimerica, however, argues that plaintiffs have admitted that the information regarding the cost of Soliris was material. In its reply brief, Unimerica sets out a list of eleven allegations made in plaintiffs' second amended complaint[65] and argues that these allegations established that Unimerica had properly invoked the Misrepresentation Clause. But none of the allegations say anything about whether Unimerica relied on the information about the pricing of Soliris in underwriting the Policy or in setting the terms and conditions of the Policy. Plaintiffs do allege that Unimerica was not provided "relevant" information about the pricing of Soliris,[66] but "relevant" does not necessarily mean the same thing as "material."

At oral argument, counsel for Unimerica suggested that there really could be no question that misrepresentation about the pricing of Soliris was material, given that the difference involved thousands of dollars each year.[67] But there are allegations in plaintiffs' second amended complaint that make it at least plausible that the misrepresentation about the pricing of Soliris did not "materially affect the underwriting, premium, rating or terms and conditions of" the Policy.[68] Plaintiffs have alleged that "[i]n November 2017 the Trust terminated ARM as the Administrator of the Trust and retained Professional Benefit

---

[65]Defendant Unimerica Insurance Company's Reply [etc.] at 4-5, Docket No. 57.

[66]Second Amended Complaint [etc.] at 28, ¶ 122c, Docket No. 43.

[67]Transcript of Oral Argument [etc.] at 12:5-13, Docket No. 76.

[68]Exhibit C at 9, Second Amended Complaint [etc.], Docket No. 43.

Services, Inc. ('PBS') to [a]dminister claims under the TDX Plan."[69]  Plaintiffs further allege

that

> [s]tarting with Hospital claims for the Patient['s] treatment
> submitted by the Hospital for payment in November 2017, and
> continuing into 2018, PBS utilized a preferred health care
> provider network that had a contract with the Hospital, and
> pursuant to the agreements, the Hospital was paid at the 60% of
> the Hospital contract rate for Patient treatment in late 2017 and
> 2018.[[70]]

Although plaintiffs do not allege exactly what this 60% rate was, it is reasonable to infer that

it was the same or similar to the $32,360.40 per Soliris infusion that the Hospital maintained

was the correct rate.[71]  Plaintiffs allege that the Policy "was renewed again for the year 2018

. . . with a specific deductible for the Patient of $450,000 for the year."[72]  It is reasonable to

infer from these allegations that Unimerica knew before it renewed the Policy in 2018 the

correct pricing for Soliris and that despite this knowledge, Unimerica did not change the

deductible amount for the Patient.  And it is reasonable to infer that if Unimerica did not

change the deductible for the Patient despite knowing the correct pricing for Soliris, then the

misinformation about that pricing in 2015 would not have "materially affect[ed] the

---

[69]Second Amended Complaint [etc.] at 17, ¶ 73, Docket No. 43.

[70]Id. at 17, ¶ 74.

[71]Id. at 8, ¶ 35.

[72]Id. at 16, ¶ 62.

-24-

underwriting, premium, rating or terms and conditions of" the Policy.[73] If the misrepresentation about the pricing of Soliris was not material, then Unimerica did not properly invoke the Misrepresentation Clause. And, if Unimerica did not properly invoke the Misrepresentation Clause, then plaintiffs' breach of contract and declaratory judgment claims are plausible and are not subject to a Rule 12(b)(6) dismissal.[74]

We turn then to plaintiffs' motion for partial summary judgment. Plaintiffs first argue that Unimerica's unilateral adjustment of the terms of the Policy violated AS 21.54.010, which applies to "group health insurance." While there is no dispute that stop-loss insurance is "health insurance" as that term is defined under Alaska law, the parties do disagree as to whether the stop-loss insurance provided by the Policy was "group health insurance."

---

[73]Exhibit C at 9, Second Amended Complaint [etc.], Docket No. 43.

[74]Plaintiffs also argued that their breach of contract and declaratory judgment claims were plausible because Unimerica's "claim of misrepresentation" is barred by the two-year statute of limitations found in AS 09.10.070. Even if Unimerica's misrepresentation defense is subject to a two-year statute of limitations, Unimerica timely raised the defense. The earliest Unimerica could be deemed to have been aware of the alleged misrepresentations would have been when the Hospital filed suit in February 2017. If, as plaintiffs contend, Unimerica first raised its misrepresentation claim in January 2019, then it did so within the requisite two years. Plaintiffs also argue that laches could apply here if the court viewed Unimerica's unilateral change to the Policy as a reformation of the Policy. Although "[e]quitable claims for rescission or reformation of a contract may be barred by the doctrine of laches[,]" Moffitt v. Moffitt, 341 P.3d 1102, 1105 (Alaska 2014), laches has no application here because Unimerica is not seeking to reform the Policy but rather it is asking the court to interpret a provision of the Policy.

AS 21.54.060(a)(1) provides that "group health insurance" is

> that form of health insurance covering groups of persons as defined below, with or without one or more members of their families or one or more of their dependents, or covering one or more members of the families or one or more dependents of the groups of persons and issued on the following basis:
>
> (1) under a policy issued to an employer or trustees of a fund established by an employer, who shall be considered the policyholder, insuring employees of the employer for the benefit of persons other than the employer[.]

Plaintiffs argue that the insurance provided in the Policy falls within this definition. Plaintiffs point out that the Policy provided that the insurance contract "consist[ed] of this Policy, Schedule of Benefits, application, approved amendments or endorsements, and a copy of the Plan Document, which is on file with the Company."[75] Because the TDX Plan is incorporated into the Policy, plaintiffs argue that the Policy protects a specific group of people, namely employees and dependents of TDX and its subsidiaries. Plaintiffs also point out that the Policy refers to deductibles as "per Covered person" and structures its rates based on the number of covered persons in a family.[76] Plaintiffs also point out that the Policy defines "Covered Expense" as "medical or other expenses under the Plan to which this Policy

---

[75]Exhibit C at 8, Second Amended Complaint [etc.], Docket No. 43.

[76]Id. at 2-3.

applies[.]"[77]    Plaintiffs argue that thus the premiums "mirror those of a group health insurance plan" as does the payment of benefits.[78]

Plaintiffs also point out that Unimerica itself has referred to the Policy as a "group policy" in various amendments and endorsements to the Policy.[79] And, plaintiffs point out that in October 12, 2015, Sheila Whatley, an "Associate Director of Underwriting at Optum, Inc.[,] which is a parent corporation of" Unimerica,[80] stated that "[i]f the application and non-refundable fee are not received" from TDX for the stop-loss insurance "by October 16, the reports provided will need to be updated, re-submitted and the group will need to be reviewed for the possibility of re-underwriting."[81]    Plaintiffs also point to Unimerica's proposal which was sent to TDX, in which Unimerica stated: "The Rate Cap will not apply if the Company determines there is a material change to the Policyholder's Plan, the terms or the conditions of the Stop Loss Policy, or the nature or composition of the group to whom the coverage is offered."[82]    Plaintiffs argue that all of this is further proof that Unimerica considered the stop-loss insurance "group health insurance."

---

[77]Id. at 4.

[78]Motion for Partial Summary Judgment at 17, Docket No. 59.

[79]Exhibit B at 4, 7, 10, Notice of Filing Exhibits, Docket No. 63.

[80]Declaration of Sheila C. Whatley at 2, ¶ 1, Docket No. 67.

[81]Exhibit D at 2, Whatley Declaration, Docket No. 67.

[82]Id. at 3.

Plaintiffs argue that other courts have held that stop-loss insurance is group health insurance and they cite to <u>Texas Department of Insurance v. American National Insurance Company</u>, 410 S.W.3d 843 (Tex. 2012). There, the Texas Supreme Court held that stop-loss insurance is not "reinsurance" but rather is "direct insurance in the nature of health insurance because the stop-loss policies are purchased by the plans ultimately to cover claims associated with their health-care expenses." <u>Id.</u> at 855. But, plaintiffs' reliance on <u>Texas Department of Insurance</u> is misplaced as the question before the court was whether stop-loss insurance was reinsurance, not whether it was group health insurance.

Although Unimerica has referred to the Policy as a group policy, that does not mean that the stop-loss insurance provided in the Policy is group health insurance as that term is defined under Alaska law. <u>See</u> <u>Western Enterprises, Inc. v. Arctic Office Machines, Inc.</u>, 667 P.2d 1232, 1234 (Alaska 1983) ("the labels used by a party to characterize its transaction are not determinative; it is the substance of the transaction and the intent of the parties that controls"). Under Alaska law, stop-loss insurance is defined as "insurance purchased by a self-insured employer to cover benefits the employer incurs in excess of a preset limit." AS 21.12.050(c). But, group health insurance "insur[es] employees of the employer. . . ." AS 21.54.060(a)(1). In short, group health insurance is purchased by employers who offer fully-funded health plans and a policy for group health insurance directly insures the employees. Stop-loss insurance, on the other hand, is purchased by employers who self-fund their health plans and a policy for stop-loss insurance insures the employer. TDX is the only

policyholder under the Policy and "Covered Persons" are persons covered by the TDX health plan, not persons covered by the Policy. The Policy itself made this clear by providing that

> [t]he Company will have neither the right nor the obligation under this Policy to directly pay any Covered Person or provider of professional or medical services. The Company's sole liability is to the Policyholder, subject to the terms and conditions of this Policy. Nothing in this Policy shall be construed to permit a Covered Person to have a direct right of action against the Company.[83]

In another provision, the Policy stated that "[t]he parties to this Policy are the Policyholder and the Company. The Company's sole liability under this Policy is to the Policyholder. This Policy does not create any right or legal relation between the Company and a Covered Person under the Plan."[84] Plainly, the Policy covered TDX, not its employees and their dependents, which means that the stop-loss insurance provided by the Policy is not group health insurance. Other courts have similarly held. In <u>Associated Industries of Missouri v. Angoff</u>, 937 S.W.2d 277, 283 (Mo. Ct. App. 1996), the court explained,

> [b]y definition, group health insurance does not provide benefits to the employer, and no policy of group health insurance is permitted to pay any benefit directly to the employer. Stop-loss insurance, on the other hand, does benefit the employer. It is issued to an employer or the trustees of a self-funded plan to protect the employer or trust from unusual or catastrophic losses. It provides no direct benefits whatsoever for any employee or their dependents.

---

[83]Exhibit C at 9, Second Amended Complaint [etc.], Docket No. 43.

[84]<u>Id.</u>

In Cuttle By and Through Stickney v. Federal Employees Metal Trades Council, 623 F. Supp. 1154, 1157 (D.C. Me. 1985), the court found that "[s]top-loss insurance is not group health insurance providing insurance to individuals through a sponsor group. Rather, it is insurance obtained to protect self-insurers from risks beyond those upon which the premiums are based." And, in American Medical Security, Inc. v. Bartlett, 915 F. Supp. 740, 746 (D. Md. 1996), the court, in rejecting an argument that a self-funded ERISA health plan was subject to indirect state insurance regulation to the same extent that a fully-insured ERISA plan was, explained that

> [t]here is a distinction between a group health insurance policy purchased by a fully insured plan, whereby the participants receive benefit payments directly from the insurer, and a stop-loss insurance policy purchased by a self-funded or self-insured plan, whereby the plan itself receives the benefit payments. The purpose of stop-loss insurance is to protect the plan from catastrophic losses and not to provide health and accident insurance directly to employees.

Because the Policy does not provide group health insurance, AS 21.54.010 has no application here. Plaintiffs are not entitled to summary judgment that Unimerica violated AS 21.54.010.

Secondly, in the alternative, plaintiffs argue that they are entitled to summary judgment on their breach of contract and declaratory judgment claims because Unimerica's unilateral adjustment of the terms of the Policy violated AS 21.51.050. AS 21.51.050(A) provides that in health insurance policies,

> [t]here shall be a provision as follows:

"Time Limit on Certain Defenses: (1) After three years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for the policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of the three-year period."

> (A) The foregoing policy provision shall not be so construed as to affect any legal requirement for avoidance of a policy or denial of a claim during the initial three-year period, or to limit the application of AS 21.51.170 - 21.51.210 in the event of misstatement with respect to age or occupation or other insurance.

> (B) A policy that the insured has the right to continue in force subject to its terms by the timely payment of premium (i) until at least age 50 or (ii) in the case of a policy issued after age 44, for at least five years from its date of issue, may contain in lieu of the foregoing the following provision (from which the clause in parentheses may be omitted at the insurer's option) under the caption "Incontestable":

"After this policy has been in force for a period of three years during the lifetime of the insured (excluding any period which the insured is disabled), it shall become incontestable as to the statements contained in the application."

As an initial matter, Unimerica argues that AS 21.51.050 does not apply to stop-loss insurance policies, even though there is no dispute that stop-loss insurance is "health insurance." Chapter 51 of Title 21 applies to "health insurance policies" and AS 21.51.020 sets out the scope and format required for a "health insurance policy." Specifically, AS 21.51.020(3) provides that

> [a] policy of health insurance . . . must insure only one person, except that a policy may insure, originally or by subsequent

> amendment, upon the application of an adult member of a family, who shall be considered the policyholder, any two or more eligible members of that family, including husband, wife, dependent children, or any children under a specified age, which may not exceed 25 years, and any other person dependent on the policyholder[.]

Unimerica argues that the use of the word "person" indicates that a "health insurance policy" must be issued to an individual human being, not to an entity such as TDX or the Trust. Unimerica argues that the references in the statute to an insured's "age", "occupation", and "lifetime" support this interpretation of the statute because an employer, such as TDX, which would purchase stop-loss insurance, does not have an age, occupation, or lifetime as those terms are generally understood.

There appears to be no Alaska case law in the insurance context defining "person" to include entities such as TDX or the Trust. But, other Alaska statutes have such a broad definition of "person." See, e.g., AS 46.03.900(18) (defining "person as "any individual, public or private corporation, political subdivision, government agency, municipality, industry, copartnership, association, firm, trust, estate, or any other entity whatsoever"). There is no reason to believe that the Alaska legislature did not intend "person" to have an equally broad meaning for purposes of AS 21.51.050. Because the Alaska legislature specifically included stop-loss insurance in the definition of "health insurance," it follows that the intent was to have such insurance be subject to regulation. There are only two choices under the insurance code, Chapter 54 which applies to group health insurance policies or Chapter 51 which applies to individual health insurance policies. As discussed

above, the Policy is not a group heath insurance policy.  Therefore, the Policy must be governed by Chapter 51.  In order for the Policy to fall under AS 21.51.020, "person" must be given a broad meaning, and not be limited to "individual live beings," as Unimerica's counsel suggested at oral argument.[85]  The court concludes that for purposes of AS 21.51.020 "person" includes a corporation or a trust and thus AS 21.51.050 applies to the Policy.

If AS 21.51.050 applies here, which it does, then plaintiffs contend that AS 21.51.050 sets out two possible incontestability clauses that can be included in health insurance policies, each of which are set out in quotation marks in the statute.  In their motion for partial summary judgment, plaintiffs contend that they are "relying on the first section of AS 21.51.050[,]"[86] although in their opposition to Unimerica's motion to dismiss, they relied on the second section.  Plaintiffs apparently realized their mistake in doing so, noting that the second section "appears to have been misplaced in the Alaska statute and literally would apply only to life insurance policies which are excluded from" Chapter 21.[87]

The question here then is what does the following provision in AS 21.51.050 mean:

> "Time Limit on Certain Defenses: (1) After three years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for the policy shall be used to void the policy or to deny a claim for loss

---

[85]Transcript of Oral Argument [etc.] at 16:2-19, Docket No. 76.

[86]Plaintiffs' First Motion for Partial Summary Judgment [etc.] at 23, n.67, Docket No. 59.

[87]Id.

> incurred or disability (as defined in the policy) commencing
> after the expiration of the three-year period."

"Statutory interpretation in Alaska begins with the plain meaning of the statute's text." Ward v. State, Dep't of Public Safety, 288 P.3d 94, 98 (Alaska 2012). "But the plain meaning of a statute does not always control its interpretation; legislative history can sometimes alter a statute's literal terms." Id. (citation omitted). "When statutory language is ambiguous, [the court] look[s] to the purpose of the legislation and the legislative history for indications of legislative intent." Municipality of Anchorage v. Adamson, 301 P.3d 569, 576–77 (Alaska 2013). If the legislative history is not helpful, then the court "adopt[s] a rule of law that is most persuasive in light of precedent, reason, and policy." State v. Public Safety Employees Ass'n, 93 P.3d 409, 416 (Alaska 2004) (citation omitted).

Plaintiffs argue that the incontestability clause in the first section of AS 21.51.050 means that an insurer is barred from denying a claim after three years from the effective date of the policy. Plaintiffs argue that the opening portion of the clause, "[a]fter three years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for the policy shall be used to[,]" establishes a three-year time limit in which an insurer can void a policy or deny a claim based on misstatements. And plaintiffs argue that last portion of the clause, "commencing after the expiration of the three-year period[,]" modifies only the word "disability." Thus, plaintiffs argue that the incontestability clause means that after three years from the effective date of the policy, an insurer is barred from using misstatements (except fraudulent ones) to

1) void the policy
<br>or
<br>2) to deny a claim for:
<br>(a) loss incurred or
<br>(b) disability . . . commencing after the expiration
of the three-year period.[88]

Plaintiffs argue that such an interpretation is consistent with subsection (A) of AS 21.51.050, which provides, in relevant part, that "[t]he foregoing policy provision shall not be so construed as to affect any legal requirement for avoidance of a policy or denial of a claim during the initial three-year period[.]" Plaintiffs argue that subsection (A) clarifies that the three-year period is the period during which claims can be denied.

Plaintiffs argue that their interpretation of AS 21.51.050 is consistent with how other courts have construed identical or similar incontestability clauses. In <u>Johnson v. Metropolitan Life Insurance Co.</u>, 251 A.2d 257, 264 (N.J. 1969), the New Jersey Supreme Court considered an incontestability clause in a health and accident policy that read:

> "Time Limit on Certain Defenses: (a) After two years from the date of policy no misstatements, except fraudulent misstatements, made by the applicant in the application for this Policy shall be used to void this Policy or to deny a claim for loss incurred or disability (as defined in this Policy) commencing after the expiration of such two year period."

The court interpreted the statute to mean "that after two years the policy may not be voided for a misstatement in the application unless the misstatement is 'fraudulent'. . . ." <u>Id.</u> at 266.

---

[88]Plaintiffs' First Motion for Partial Summary Judgment [etc.] at 24, Docket No. 59.

-35-

In <u>Galanty v. Paul Revere Life Insurance Company</u>, 1 P.3d 658, 660 (Cal. 2000), the

California Supreme Court "consider[ed] the effect of a standard incontestability clause that

the Insurance Code requires policies of disability insurance to include." "Section 10350.2

offers a choice of two forms, labeled A and B, to insurers writing noncancellable policies of

disability insurance[.]" <u>Id.</u> at 667. Form A provides:

> "After two years from the date of issue of this policy no
> misstatements, except fraudulent misstatements, made by the
> applicant in the application for such policy shall be used to void
> the policy or to deny a claim for loss incurred or disability (as
> defined in the policy) commencing after the expiration of such
> two-year period."

<u>Id.</u> The court observed that "Form A . . . offers insurers greater protection against fraud by

insureds than the incontestability clause required in life insurance policies" because "[t]he

latter does not permit the insurer, in most cases, to challenge the policy or its own liability

on account of fraudulent statements by the insured in the application for insurance after the

period of contestability has run." <u>Id.</u> The court then proceeded to discuss Form B which was

the form included in the Paul Revere policy in question. <u>Id.</u> Form B provided: "'After this

policy has been in force for a period of two years during the lifetime of the insured

(excluding any period during which the insured is disabled), it shall become incontestable

as to the statements contained in the application.'" <u>Id.</u> But, because the instant case does not

involve an incontestability clause similar to that in Form B, <u>Galanty</u> has little application

here.

In Sutton v. American Health & Life Insurance Company, 683 F.2d 92, 93 (4th Cir. 1982), American had cancelled Sutton's disability insurance policy based on alleged misrepresentations made in her application. Virginia state law required insurance policies to have the following incontestability clause:

> After two years from the date of issue of this policy, no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such two-year period.

Id. at 94. The court interpreted this clause to mean that "American could only void the policy after the two-year period had elapsed if any misstatements in the application were fraudulent." Id. at 95. The court rejected American's argument "that the two-year limitation should not be applied because the disability arose before the policy had been in effect two years and that it therefore had a right to deny the claim because of material misrepresentations." Id. The court explained that American's argument failed "because American can only deny the claim by rescinding the contract" and "[w]hen a claim is denied because of misrepresentations in the application for insurance the thesis can only be that the insurer has rescinded the contract on that account[.]" Id. (citation omitted). The court observed that the "purpose of a clause placing a time limit on challenges to the insurance application is to give security to the policyholder, and sensibly that purpose is achieved by measuring the period of contest from the date of the issuance of the policy rather than from the date when a disability happens to occur." Id. at 95-96 (citation omitted).

Plaintiffs argue that if their interpretation of AS 21.51.050 is correct, then Unimerica's conduct violated the statute because Unimerica denied the Patient's claims more than three years after the effective date of the Policy. The Policy became effective on January 1, 2016 and Unimerica denied the Patient's claims on January 28, 2019.

AS 21.51.050 is not ambiguous. The most common sense reading of the statute is that "after the expiration of the three-year period" applies to both "loss incurred" and "disability commencing", in large part because there is no punctuation between "loss incurred" and "disability commencing." The court concludes that the statute provides that an insurer cannot rely on a non-fraudulent statement to deny a claim for losses incurred after the expiration of the three-year period or deny a claim for a disability which commenced after the expiration of the three-year period. Or, to put it another way, the insurer <u>can</u> rely on non-fraudulent misstatements to deny a claim for losses incurred prior to the expiration of the three-year period.

This interpretation is consistent with the way other courts have construed similar incontestability clauses. In <u>Commercial Insurance Company of Newark, New Jersey v. Krain,</u> 843 F. Supp. 404, 405 (N.D. Ill. 1994), Commercial had issued a major medical policy and a disability policy to Krain. Commercial sought to rescind the policies based on misrepresentations Krain allegedly made in his applications. <u>Id.</u> at 405-06. One policy provided that

> [a]fter two years from the effective date of a person's insurance, no statements, unless fraudulent, made by such person may be

used to void the insurance or deny a claim for loss incurred or
disability which begins after the end of such two year period.

Id. at 406. The other policy provided that

> [i]f You made a misstatement on the application for this Policy,
> We may not use it to void this Policy or to deny a claim for loss
> incurred or disability that starts after 2 years from the effective
> date. But if the misstatement was fraudulent there is no time
> limit.

Id.  The court found that this "language clearly applies to situations in which the loss or
disability occurs more than two years after the effective date" and that "Commercial may use
any misstatements on the application to void the policy or deny a claim for loss incurred or
disability that starts less than two years after the effective date."  Id.

In Russell v. Royal Maccabees Life Insurance Company, 974 P.2d 443, 445 (Ariz. Ct.
App. 1998), the court interpreted an incontestability statute that read:

> Time limit on certain defenses: (a) After two years from the date
> of issue of this policy no misstatements, except fraudulent
> misstatements, made by the applicant in the application for such
> policy shall be used to void the policy or to deny a claim for loss
> incurred or disability (as defined in the policy) commencing
> after the expiration of such two year period.

The court found this language "plain and unambiguous" and that it meant that "an insurer can
only void an insurance policy or deny a claim for loss incurred or disability originating two
years from the date of issuance of the policy if the insurer proves that the applicant made a
fraudulent misstatement in the application for the insurance policy."  Id. at 445-46.

In Legel v. American Community Mutual Insurance Company, 506 N.W.2d 530, 531 (Mich. Ct. App. 1993), the insurance policy contained the following clause:

> After two years from the Policy Date of this policy no misstatements, except fraudulent misstatements, made by the applicant in the original application for this policy shall be used to void the policy or deny a claim for loss incurred by or on behalf of any Family Member insured on the Policy Date commencing after the expiration of such two year period.

The plaintiffs argued that this language meant that the policy "could not be canceled for misstatements after two years from the effective date of the policy." Id. The court disagreed and held that "[b]ecause the claim [in question] occurred within two years of the effective date of the policy, defendant could properly cancel plaintiffs' policy" based on non-fraudulent misrepresentations made in the application. Id. at 532.

As construed by the court, AS 21.51.050 does not prohibit an insurer from relying on non-fraudulent misstatements to deny a claim for losses incurred prior to the expiration of the three-year period. Here, Unimerica denied claims, based on the misrepresentation about the pricing of Soliris, for losses that were incurred prior to the expiration of the three-year period. While the question remains as to whether Unimerica properly denied those claims, there is no question that if it did, it did not violate AS 21.51.050 in the process. Thus, plaintiffs are not entitled to summary judgment that Unimerica's conduct violated AS 21.51.050.

In sum, plaintiffs' breach of contract and declaratory judgment claims are plausible. It is plausible that the misrepresentation about Soliris did not "materially affect the

underwriting, premium, rating or terms and conditions" of the Policy.[89]  But, plaintiffs are not entitled to summary judgment on these claims because AS 21.54.010 does not apply to the Policy and because if Unimerica properly invoked the Misrepresentation Clause, which is a material fact in dispute, it did not violate AS 21.51.050 in the process.

bad faith claim

"Under Alaska's contract law, 'the covenant of good faith and fair dealing . . . is implied in all contracts.'"  Lockwood v. Geico General Ins. Co., 323 P.3d 691, 697 (Alaska 2014) (quoting State Farm Mut. Auto. Ins. Co. v. Weiford, 831 P.2d 1264, 1266 (Alaska 1992)).  "Although" the Alaska Supreme Court has "declined to define the elements of the tort of bad faith in an insurance contract," the insured must at least "show that the insurer's actions were objectively unreasonable under the circumstances."  Id.

Unimerica argues that plaintiffs' bad faith claim should be dismissed because plaintiffs will never be able to show that Unimerica's actions were objectively unreasonable. Unimerica contends that it reasonably relied on the Misrepresentation Clause, which it insists makes plaintiffs' bad faith claim implausible.  Unimerica argues that allegations of bad faith claims handling are irrelevant in the face of an explicit policy provision on which the insurer relied.

Plaintiffs argue, however, that they have alleged that Unimerica's conduct was not objectively reasonable.  They point out that they have alleged that Unimerica "deliberately,

---

[89]Exhibit C at 9, Second Amended Complaint [etc.], Docket No. 43.

and without any reasonable basis, reset[] the Patient's laser from $450,000 to $1,050,000 for each of the years 2016, 2017, and 2018 to deliberately make the revised laser high enough in order to avoid any liability on the Patient's claims[.]"[90] Plaintiffs argue that this is sufficient to make their bad faith plausible.

Plaintiffs cite to <u>Seymour Tubing, Inc. v. TIG Insurance Company</u>, Case No. IP020509CBS, 2004 WL 2272160 (S.D. Ind. Sept. 24, 2004), in support. There, the court rejected TIG's contention that because it had reserved the right to modify the stop-loss policy, "TIG's refusal to reimburse claims for AB, which totaled less than the modified laser, cannot constitute bad faith." <u>Id.</u> at *10. The court found that Seymour Tubing's bad faith claim was based on more than "a dispute over the propriety of TIG's decision not to reimburse Seymour Tubing for AB's medical claims." <u>Id.</u> The court found that a reasonable jury could conclude that "TIG waited to send written notification of the laser on AB until it had enough information to set a laser sufficiently high to avoid liability for her claims[.]" <u>Id.</u>

Here, as in <u>Seymour Tubing</u>, plaintiffs' bad faith claim is based on more than just an allegation that Unimerica's reliance on the Misrepresentation Clause to deny the November 2018 claim was unreasonable.[91] In particular, plaintiffs have alleged that Unimerica delayed re-setting the Patient's laser until after the Patient died, effectively precluding plaintiffs from

---

[90]Second Amended Complaint [etc.] at 54, ¶ 221(e), Docket No. 43.

[91]<u>Id.</u> at 53-54, ¶ 221.

switching to another stop-loss carrier.[92]  Plaintiffs' bad faith claim is plausible and is not subject to a Rule 12(b)(6) dismissal.

punitive damages claim

In Alaska, punitive damages are only available for "conduct [that] could fairly be categorized as 'outrageous, such as acts done with malice or bad motives or reckless indifference to the interests of another.'" Weiford, 831 P.2d at 1266 (quoting State Farm Fire & Casualty Co. v. Nicholson, 777 P.2d 1152, 1158 (Alaska 1989)).  Unimerica argues that plaintiffs have not alleged that it acted with malice or reckless indifference, that all plaintiffs have alleged is that Unimerica adjusted the terms of the Policy after it learned of the misrepresentations made by ARM and that it denied the claims plaintiffs submitted in 2018 based on the new policy terms.  And even if it is plausible that Unimerica acted in bad faith, Unimerica reminds plaintiffs that "an allegation that [the insurer] violated the implied covenant of good faith and fair dealing is not sufficient to support a claim for punitive damages."  Great Divide Ins. Co. v. Carpenter ex rel. Reed, 79 P.3d 599, 612 (Alaska 2003).  Unimerica argues that all plaintiffs have alleged is that Unimerica intentionally denied the Hospital claims, which is not sufficient to make their punitive damages claim plausible.

While it does not strike the court that this is punitive damages case, at the motion to dismiss stage, the court only considers whether a claim is plausible.  If plaintiffs were to

---

[92]Id.

prevail on their bad faith claim, it may be plausible that a fact finder would conclude that Unimerica acted with reckless indifference.

UTPA claim

Plaintiffs concede that the UTPA does not apply to Unimerica's actions and that their UTPA claim should be dismissed.[93]

Conclusion

Unimerica's motion to dismiss is granted in part and denied in part. It is granted as to plaintiffs' UTPA claim. It is otherwise denied. Plaintiffs are not given leave to amend as to their UTPA claim as amendment would be futile.

Plaintiffs' motion for partial summary judgment is denied.

DATED at Anchorage, Alaska, this 19th day of December, 2019.

/s/ H. Russel Holland    <br>United States District Judge

---

[93]Plaintiffs' Opposition to Unimerica Insurance Company's Motion to Dismiss the Second Amended Complaint at 36, Docket No. 54.